### NORTHERN STATES POWER COMPANY, Plaintiff,

v.

### The UNITED STATES, Defendant.

### No. 98–484C.

United States Court of Federal Claims.

April 6, 1999.

---

12. Defendant agrees that a remand in these circumstances would be appropriate. *See* Tr. at 19,

33.

Alex D. Tomaszczuk and Devon E. Hewitt, Shaw, Pittman, Potts & Trowbridge, McLean, Virginia. Jay E. Silberg, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., and Michael C. Connelly, Northern States Power Company, Minneapolis, Minnesota, for plaintiff.

Doris Finnerman, with whom were former Assistant Attorney General Frank W. Hunger, Director David M. Cohen, former Assistant Director Joseph A. Kijewski, Harold D. Lester, Jr., Civil Division, Department of Justice, Washington, D.C., and Dow Davis, Department of Energy, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

Plaintiff, a public utility, and the Government, acting through the Department of Energy ("DOE"), entered into a contract requiring plaintiff's payment of fees into a DOE-administered fund in return for that agency's acceptance for disposal and permanent storage (beginning January 31, 1998) of radioactive wastes produced as a by-product of plaintiff's electric power generating facilities. To date, DOE has not begun to fulfill its contract responsibilities.

The single question we are now called upon to decide is whether plaintiff may seek to enforce its contract rights through a claim for breach damages in this court (plaintiff's position) or, instead, is obliged by the terms of its contract with DOE to pursue its demand for monetary relief at the agency level, i.e., through a claim for equitable adjustment submitted in accordance with the contract's disputes clause (defendant's position).

The issue, which is presented here on defendant's motion to dismiss and plaintiff's cross-motion for summary judgment, has been fully briefed and argued by the parties. We conclude that plaintiff is required to pursue its contract remedies and accordingly grant defendant's motion to dismiss.

## FACTS

*Statutory Background*

The Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101–10270 (1994 & Supp. II 1996) (the "Act") is a comprehensive statute that outlines the respective responsibilities of the federal government, state regulatory agencies, and public utilities, for resolving the national problem created by the accumulation of spent nuclear fuel generated from nuclear reactors, and radioactive waste generated from the reprocessing of such fuel. The Act assigns to the federal government the responsibility to provide for the permanent disposal of these contaminants, and it directs that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel." 42 U.S.C. § 10131(a)(4).

Section 302(a)(1) of the Act authorizes the Secretary of DOE to enter into contracts with owners and generators of spent nuclear fuel, pursuant to which DOE is to accept, transport, and dispose of the spent nuclear fuel in exchange for the payment of fees. 42 U.S.C. § 10222(a)(1). Section 302(a)(5) sets forth the contractual responsibilities that DOE is to assume:

(5) Contracts entered into under this section shall provide that—

(A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and

(B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.

42 U.S.C. § 10222(a)(5).

The contract fees are set forth in subsections 302(a)(2) and (a)(3) of the Act. Those subsections prescribe a one-time fee based on the amount of spent nuclear fuels and high-level radioactive wastes generated from the production of electrical energy prior to the effective date of the Act (January 7, 1983), and an ongoing fee for nuclear fuel wastes generated from energy production operations continuing after the Act's effective date. 42 U.S.C. § 10222(a)(2)-(3). Upon payment of the fees required for the delivery of the nuclear wastes to the Government, no further financial obligation is owed the Government for the costs associated with long-term storage or disposal.

Pursuant to section 302(c) of the Act, all fees collected by the Secretary of DOE are to be deposited into a fund, the Nuclear Waste Fund, to be maintained in an account at the United States Treasury. 42 U.S.C. § 10222(c). The Act specifies that the Secretary may make expenditures from the Waste Fund only for administrative and operational purposes having a direct bearing upon radioactive waste disposal activities. 42 U.S.C.

§ 10222(d). Additionally, the Act charges the Secretary with reviewing the financial soundness of the Waste Fund and with recommending to Congress adjustments in fees when necessary to insure the Federal Government's recovery of the costs incurred in carrying out the disposal functions. 42 U.S.C. § 10222(a)(4).

*The Standard Contract*

On April 18, 1993, following notice and comment, DOE promulgated a "Standard Contract for Disposal of Spent Nuclear Fuel [SNF] and/or High–Level Radioactive Waste [HLW]" ("Standard Contract") implementing section 302 of the Act. 10 C.F.R. § 961 (1998).

Article II of the contract, titled "Scope," sets forth the parties' basic responsibilities. It reads as follows:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, ·not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II.

Article IX, "Delays," is one of the contract's several adjustment clauses. Its text is as follows:

> A. Unavoidable Delays by Purchaser or DOE
>
> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control

and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE—such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather—cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

> B. Avoidable Delays by Purchaser or DOE
>
> In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

10 C.F.R. § 961.11, Art. IX.

The contract also contains a "Remedies" clause. That clause, appearing in Article XI, provides:

> Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

10 C.F.R. § 961.11, Art. XI.

Finally, there is included in the contract an Article XVI, titled "Disputes," the purpose of which is to provide an administrative mechanism for the resolution of contract disputes arising under the contract. That clause, the first and last paragraphs of which contain wording that mirrors the version of the disputes clause as it appeared in government contracts prior to the enactment of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1994), reads as follows:

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C. For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; provided, however, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

10 C.F.R. § 961.11, Art. XVI.

*Contract Execution*

Northern States Power owns and operates commercial nuclear power plants located in Monticello and Red Wing, Minnesota. On June 20, 1983, following codification of the Standard Contract, Northern States executed a contract with DOE for the disposal of Northern States' spent nuclear fuel and high-level radioactive waste beginning "not later than January 31, 1998" and continuing thereafter until all such materials were disposed of. Pursuant to this contract, Northern States has thus far paid DOE approximately $250 million. DOE, however, has not begun the acceptance, transportation and disposition of Northern States' spent nuclear fuel or high-level radioactive wastes.

*Related Litigation*

By 1994, DOE had come to recognize that the lack of a repository would preclude it from commencing storage operations until at least the year 2010. To address this issue, it published a "Notice of Inquiry on Waste Acceptance Issues" in the Federal Register requesting the views of affected parties. 59 Fed.Reg. 27,007 (1994). Following a comment and review period, DOE issued its "Final Interpretation of Nuclear Waste Acceptance Issues," 60 Fed.Reg. 21,793 (1995), adopting the position that "it does not have a legal obligation under either the Act or the Standard Contract to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the Act." *Id.* at 21,794. The agency also determined that if the Act were construed to obligate it unconditionally to begin disposal services by January 31, 1998, then "the appropriate remedy [for those affected by DOE's untimeliness in performance] would be the contractual remedy under the

Delays Clause and Article XVI [*i.e.*, the Disputes clause]." *Id.* at 21,797.

Following DOE's issuance of its Final Interpretation, a number of public utilities and state regulatory bodies filed a petition for review of the agency's ruling in the United States Court of Appeals for the District of Columbia Circuit pursuant to section 119 of the Act, 42 U.S.C. § 10139.[1] Their suit was successful. In *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C.Cir.1996) the court of appeals rejected DOE's interpretation of its obligations under the Act. Finding that DOE's duty to begin disposing of nuclear wastes was not conditional on the existence of a repository, the court held that the Act's requirement directing the Secretary to begin disposal activities "not later than January 31, 1998" was "without qualification or condition." *Id.* at 1276. The court explained that DOE's contrary interpretation of its obligations under the Act and the Standard Contract "blue-pencil[ed] out" the 1998 deadline and therefore destroyed the "quid pro quo created by Congress." *Id.*

Notwithstanding the decision in *Indiana Michigan,* the problem it addressed was not put to rest. Following that decision, DOE took the position that even though its obligation to begin disposing of radioactive waste by the 1998 deadline had been held to be unconditional, the fulfillment of that obligation could not be accomplished because of unavoidable delays. Interested parties were so advised.

A second lawsuit ensued: *Northern States Power Co. v. Department of Energy*, 128 F.3d 754 (D.C.Cir.1997). This time around, the petitioners (again, state regulatory commissions and public utilities, including the present plaintiff, Northern States) sought a writ of mandamus requiring DOE to comply with the *Indiana Michigan* decision and to begin accepting nuclear wastes.

The application for mandamus relief was granted, but only in part. In a decision issued on November 14, 1997, the court concluded that issuance of a writ of mandamus was appropriate to correct DOE's misapprehen-

sion of the court's prior ruling: "[w]e therefore issue a writ of mandamus precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." *Id.* at 761. But, as to the balance of the specific relief that was asked for—the demand that DOE be directed to begin accepting high-level radioactive wastes and spent nuclear fuels by January 31, 1998—this the court denied. It was the court's view that the administrative remedies provided by the Standard Contract—in particular, the delay clause and the disputes clause—afforded petitioners an adequate means of redress in the event of DOE's default. The court explained:

> Petitioners have not convinced us that this contractual scheme is inadequate to deal with DOE's anticipated delay in accepting the SNF. Petitioners have suggested that the contractual processes are inadequate, claiming that they will "suffer additional billions of dollars in additional costs if DOE fails to meet its January 1998 obligation," ... and that they will not be able to recover these costs in the contract proceedings because the Department is excusing its own default.... Such costs may in fact ensue if DOE fails to perform on time, but there is no reason to believe that these additional expenses will not be taken into account if the contractual processes operate as Congress intended.... Accordingly, we conclude that petitioners must pursue the remedies provided in the Standard Contract in the event that DOE does not perform its own duty to dispose of the SNF by January 31, 1998. This conclusion, we should note, comports with our decision in Indiana Michigan. Even though we did not enter a remedy at that time, we suggested that the provisions of the Standard Contract would determine the appropriate remedy for the Department's failure to perform its obligations.

128 F.3d at 759.

Following issuance of the decision in *Northern States,* the parties moved for re-

---

1. Section 119 states "the United States courts of appeals shall have original and exclusive juris-
diction over any civil action ... for review of any final decision or action of the Secretary."

consideration and additional relief. In particular, the state petitioners and the utilities requested the court to issue an order that would: (i) bar DOE from using utility and ratepayer-supplied monies in the Nuclear Waste Fund to satisfy any monetary entitlement awarded them under the Standard Contract, (ii) authorize the payment of NWF fees into an interest-bearing escrow account, and (iii) require DOE to file a plan for disposing of radioactive wastes before accepting any further shipment of such materials from other sources, foreign and domestic. As to DOE's application for rehearing, it sought reconsideration on the claimed ground that the court's decision improperly intruded upon the adjudication of contract disputes arising under the Standard Contract and thus usurped the jurisdictional mandate given to the Court of Federal Claims by the Tucker Act, 28 U.S.C. § 1491 (1994).

The request for rehearing and for additional relief was denied. In an unpublished order dated May 5, 1998, *Northern States Power Co. v. Department of Energy*, 1998 WL 276581 (D.C.Cir.), the court of appeals declined to express an opinion on the "legality of the DOE's using utility or ratepayer-supplied monies to pay costs or damages," or on the "adequacy of any particular type of equitable adjustment of fees that might be awarded to utilities under the Delays Clause of the Standard Contract." The court continued:

> Our decision in Northern States barred the DOE from interpreting the Contract as imposing only a contingent disposal obligation; such an interpretation, we ruled, would place the DOE in violation of its statutory duties under the Nuclear Waste Policy Act ("NWPA"), which required it to undertake an unconditional obligation. Beyond that clarification of the statute's requirements, we remitted the utilities to their remedies under the Standard Contract.

*Id.* at *1.

As to the other relief the utilities had requested, this the court denied on the ground that it went beyond the scope of the *Northern States* mandate:

> The second and third elements of the State Petitioners' requested order constitute equitable contract remedies against the DOE and fall outside the scope of the Northern States mandate. Northern States describes the nature of the DOE's obligation, which was created by the NWPA and undertaken by the DOE under the Standard Contract. It does not place the question of contract remedies in this court, nor set up this court as a source of remedies outside the Standard Contract.

*Id.* at *1–*2.

Similarly, the court of appeals rejected DOE's argument for reconsideration saying that DOE's "statutory duty to include an unconditional obligation in the contract [to begin acceptance of radioactive wastes by January 31, 1998] is independent of any rights under the contract. The Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA." *Id.* at *2.

In September 1998, DOE petitioned the Supreme Court for a *writ of certiorari*. The petition was denied on November 30, 1998. *Department of Energy v. Northern States Power Co.,* —— U.S. ——, 119 S.Ct. 540, 142 L.Ed.2d 449.

*Plaintiff's Complaint*

On June 8, 1998, plaintiff filed a complaint in this court stating that DOE had failed to comply with its contractual obligations to begin disposing of nuclear wastes by January 31, 1998 and, as a result, Northern States had incurred and would continue to incur substantial costs for extended on-site storage of its spent fuel and high-level radioactive waste. The complaint also states that, as currently authorized by the State of Minnesota, Northern States' on-site storage facilities can accommodate the operation of its generating units only until the year 2007. Thereafter, Northern States alleges, absent regulatory approval permitting an expansion of on-site storage capacity, it will also face the additional costs of developing alternative off-site storage sites. Plaintiff's complaint is framed in two counts: Count I—Partial Breach of Contract, and Count II—Breach of the Implied Covenant of Good Faith and Fair

Dealing. The complaint estimates plaintiff's expected injuries at $1,000,000,000.

*The Pending Motions*

The Government has moved for dismissal of the complaint on the ground that plaintiff is contractually obligated to pursue its relief through a claim for an equitable adjustment submitted pursuant to the contract's disputes clause. Two basic arguments are advanced in support of this position. First, defendant maintains that the issue of whether Northern States must exhaust its contract remedies before seeking relief in court was actually litigated before, and decided by, the D.C. Circuit. That court, defendant contends, has ruled that plaintiff's remedies lie in a claim for equitable adjustment under the contract's disputes clause. Based on this contention of prior adjudication, defendant argues that plaintiff's complaint in this court is barred by *res judicata.*

Second, as an alternative argument, defendant offers the contention that plaintiff contractually agreed to an administrative remedy for the resolution of disputes arising under the contract and therefore has no standing now to pursue a breach of contract action in this court.

Plaintiff disagrees with each of the Government's arguments and has cross-moved for summary judgment, citing, as the basis for its claim, DOE's failure to begin the disposal of spent nuclear fuel and high-level radioactive waste by January 31, 1998, as well as the agency's declared inability to undertake the performance of its contract duties before the year 2010 at the earliest.

## DISCUSSION

### I

We begin our discussion with defendant's contention that, on the basis of *res judicata,* plaintiff is foreclosed from litigating a claim for breach of contract in this court, but is bound instead to pursue the contractual remedies set out in the Standard Contract.

■ The rules of *res judicata* are intended to secure finality in litigation. Broadly stated, the rules bar a litigant from pursuing in a second action a demand for relief that was fully and fairly addressed in an earlier one. Importantly, the rules operate as a bar not only to a second action on the same claim, but also as a bar to the relitigation of those issues of fact or law whose resolution was essential to the prior determination. Section 27 of the Restatement (Second) of Judgments (1982) sets forth this rule of issue preclusion:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

■ The argument defendant presents here rests on the rule of issue preclusion. Specifically, defendant contends that plaintiff, in its quest for mandamus relief before the D.C. Circuit, presented the contention, among others, that it lacked an adequate remedy at law—and hence was entitled to specific relief—because the remedy provided by the contract did not offer complete relief for DOE's failure to perform. Defendant points out that this same argument—the alleged unavailability of complete relief under the contract—is the underpinning for plaintiff's present argument claiming a right to by-pass the contract's disputes procedure in favor of a breach action in this court. And inasmuch as the argument purportedly was considered by the D.C. Circuit and rejected by that court—"we conclude that petitioners must pursue the remedies provided in the Standard Contract," *Northern States Power Co. v. Department of Energy,* 128 F.3d at 759—defendant argues that the present action must be dismissed on grounds of *res judicata.*

Although the argument defendant presents seems compelling on its face, it harbors a difficulty that leads us to reject it. The problem that we have with the argument is that, although the D.C. Circuit largely denied the request for mandamus relief and directed plaintiff to pursue its administrative remedies, the court made no judgment about the sufficiency of those procedures beyond identifying them as offering "a potentially adequate remedy." *Id.* at 761. The limited

reach of the D.C. Circuit's determination is clearly expressed in its Order of May 5, 1998. There, in denying the parties' several requests for rehearing and reconsideration, the court explained that its decision in *Northern States* "does not place the question of contract remedies in this court." 1998 WL 276581, at *2 (D.C.Cir.). And, on the same point, the court added, "[w]e do not address the question of the adequacy of damages or of any contract remedy." *Id.* Thus, it was simply the existence of those remedies as opposed to any determination regarding the completeness of the relief they afforded that explains the D.C. Circuit's decision.

In this court, however the concern does focus on the adequacy of the relief available to plaintiff under the disputes clause of the Standard Contract. One of plaintiff's central contentions is that, under accepted principles of government contract law, a contractor is not required to pursue relief under the contract unless that relief reasonably approximates the damages recoverable in an action for breach of contract. Although we do not agree with this contention (for reasons later discussed), it is clear that we cannot invoke the rule of issue preclusion to deny plaintiff the opportunity to argue a point of law that the D.C. Circuit took care to point out was not comprehended by its opinion in *Northern States*. For this reason then, the argument of *res judicata* is rejected. We move on to address the parties' principal arguments.

II

The disputes clause in the parties' contract specifies that "any dispute concerning a question of fact arising under this contract" that is not disposed of by agreement shall be decided by the contracting officer whose decision shall be final and conclusive unless appealed to the DOE Board of Contract Appeals within 90 days. The quoted words— "any dispute concerning a question of fact arising under this contract"—are words of settled meaning, adopted from the standard disputes clause in use prior to the enactment of the Contract Disputes Act of 1978, *see, e.g.,* 41 C.F.R. § 1.7.102–12 (1977), and commonly understood to embrace all controversies occurring during contract performance

that involve facts susceptible to relief under any of the contract's specific adjustment clauses, such as the changes clause, the differing site conditions clause, or the delay damages clause. *See United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 402, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). As part of the settled meaning of the clause, it is also understood that where "relief [is] available under the contract, . . . the contractor must exhaust his administrative remedies." *Id.*

Given these conventional understandings— understandings which we have no reason to assume were not also embodied in the Standard Contract—the question we encounter is straightforward: Recognizing that the Standard Contract contains a delays clause (Article IX—Delays) that purports to offer a remedy for avoidable delays occasioned either by the purchaser or DOE, is plaintiff not therefore obliged to pursue its claim as a dispute concerning a question of fact arising under the contract? The Government argues exactly that: plaintiff has a contract-provided remedy and must pursue that remedy or forfeit all opportunity for relief. Plaintiff disagrees and offers us a number of arguments as to why the Government's position should be rejected. We examine these below but find none persuasive.

*A. The Argument Based on Definition*

▮ Plaintiff begins with the contention that the default in the Government's promised performance that has occurred to-date, and that is expected to continue until at least the year 2010, is not a delay of the sort comprehended by the contract's avoidable delays provision. That clause, plaintiff maintains, speaks only to specific contingencies that arise after performance has begun, and not to circumstances where fulfillment of the bargain is expected to be put off for more than a decade. The language of the clause in question reads as follows:

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the

charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

10 C.F.R. § 961.11, Art. IX.

In its reading of the above-quoted text, plaintiff focuses on the opening words—"any delay in the delivery, acceptance, or transport of SNF and/or HLW"—and it places particular emphasis on the word "in." The use of the word "in" in this context, argues plaintiff, is synonymous with the word "during," thus indicating that the specified activity—the delivery, acceptance or transport of SNF—relates to a task already begun, that is, an activity in progress at the time the delay first occurs. Support for plaintiff's understanding of the word "in" is drawn from the *American Heritage Dictionary* 648 (2d ed.1985) which includes, among other meanings for the word "in," the definition "during the act or process of."

The Government answers this argument by saying that the interpretation plaintiff espouses simply reflects plaintiff's own choice of definitions. The word "in," the Government points out, also includes the meaning "with reference to, as regards." And this definition, defendant goes on to say, supplies the more plausible usage intended here because it connects more logically to the clause's use of the expansive word "any" in addressing recognizable delays.

We read the clause in the same way the Government does. Taken at face value, the words "any delay in the delivery, acceptance or transport of SNF" include not only delays during performance but also delays preceding the commencement of performance. This reading is necessitated by the term "any"—a word which, in standard usage, is understood to mean "one or all ... indiscriminately of whatever quantity." *Webster's New International Dictionary* 121 (2d

ed.1939). Thus, to give this word its full and proper effect here, one would have to say that "any" delay in delivery, acceptance or transport of SNF necessarily comprehends *all* expected deliveries, acceptances and transports of SNF whether occurring before or after commencement of those services. Only this reading preserves the common understanding of the term "any."

## B. *The Arguments of "Cardinal Change" and "Constructive Suspension"*

■ A second argument that plaintiff presents is the contention that even if the court were to conclude that DOE's delay fell within the literal reach of the avoidable delays provision, nevertheless, because of the magnitude of that delay, it would be inappropriate to require Northern States to pursue the remedies provided under that provision. The forecasted twelve-year delay in the Government's commencement of its contract duties, plaintiff maintains, represents a time departure from the promised performance so extreme in length as to be beyond the risks of delay reasonably foreseeable at the time of contract formation. Hence, the avoidable delays provision should not be held controlling.

Plaintiff offers two rationales in favor of this result. First, it invokes the so-called "cardinal change" doctrine; second, it argues in favor of a "constructive suspension" analysis. Neither fits here.

Under the changes clause of a government contract, a contracting officer is granted authority at any time, by written order, and without notice to the sureties, to "make changes within the general scope of the contract."[2] When, in the purported exercise of this authority, the contracting officer orders a change in the work of such magnitude or content as, in the contractor's view, to fall outside the general scope of the work, the resulting change is described as a "cardinal"

**2.** The standard changes clause specified for use in a fixed-price supply contract grants a contracting officer the authority, "at any time, by written order, and without notice to the sureties, if any [to] make changes within the general scope of this contract, in any one or more of the following:

(1) Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications.
(2) Method of shipping or packing.
(3) Place of delivery."
48 C.F.R. § 52.243–1 (1998).

change. Under the standard disputes clause in use prior to the enactment of the Contract Disputes Act of 1978, a dispute in respect to a cardinal change was deemed to involve a dispute arising outside of the contract—as opposed to a dispute concerning a question of fact arising under the contract—and, hence, was not resolvable under the contract's disputes mechanism. Instead, the contractor's remedy lay in court through a suit for breach. Cases illustrating the point include *Edward R. Marden Corp. v. United States*, 194 Ct.Cl. 799, 808, 442 F.2d 364, 369 (1971), and *Air–A–Plane Corp. v. United States*, 187 Ct.Cl. 269, 275–76, 408 F.2d 1030, 1032–33 (1969).

Plaintiff attempts to invoke the equivalent of the cardinal change doctrine here by arguing that the magnitude of the Government's indicated delay is of such breadth and duration as to go beyond the limitations embodied in the avoidable delays clause. Though not literally described as such, plaintiff's position amounts to a claim of "cardinal delay."

The difficulty with this argument is that unlike the changes clause, which places a limitation on the contracting officer's authority—changes must be "within the general scope of the contract"—no similar restriction is to be found in the avoidable delays provision. Rather, that clause speaks to "any" delay in the delivery, acceptance or transport of spent nuclear fuels or high-level radioactive waste. Given this explicit wording, the court can reach no other conclusion than to say that the delay in question comes within the scope of the avoidable delays clause.[3] Accordingly, the dispute regarding that delay raises a question of fact that is resolvable under the contract's disputes clause.

■■■■ As to the alternative argument that plaintiff offers against the applicability of the avoidable delays provision—that the delay in issue amounts to a constructive suspension— this too we reject. A constructive suspension refers to a situation where the Government

has unreasonably delayed the progress of the work but has failed formally to acknowledge the delay through the issuance of an order under the contract's suspension of work clause. In such circumstances, the courts will regard as done what should have been done and therefore direct the Government to provide the contractor with an equitable adjustment in the contract's performance costs. *Merritt–Chapman & Scott Corp. v. United States*, 192 Ct.Cl. 848, 870, 429 F.2d 431, 443–44 (1970). Similarly, where the Government has unreasonably delayed the progress of the work but the contract lacks a suspension of work clause, then the Government will be found liable for a breach of contract. *Monroe Garment Co. v. United States*, 203 Ct.Cl. 324, 337, 488 F.2d 989, 996 (1973); *F.H. McGraw & Co. v. United States*, 131 Ct.Cl. 501, 130 F.Supp. 394 (1955).

■■■ Relying on the cited cases, plaintiff makes the argument that Government-caused unreasonable delay is an extra-compensable event which, in the absence of a suspension of work clause, becomes redressable as a claim for breach of contract. And, the argument continues, since in this case, the suspension clause was narrowly focused—the clause permits DOE to suspend its performance only upon the purchaser's failure to perform or in the event of a national emergency—it does not literally reach the present delay. Accordingly, the court is urged to treat the present delay as a constructive suspension—an actual but unacknowledged period of unreasonable delay— and permit the claim to proceed as a breach of contract.

There is a two-fold problem with this argument. As an initial matter, the court cannot invoke the doctrine of constructive suspension to afford the purchaser a remedy with respect to events that the parties' contract itself does not recognize as the basis for a suspension order. As we have noted, the

---

**3.** We add, by way of footnote, that while a twelve-year postponement in the commencement of the Government's promised performance would seem to stretch the concept of "delay" to the breaking point, it is worth keeping in mind that, by the terms of the contract, that performance was not to begin until some fifteen years

after the contract first was executed. Moreover, once begun, performance was expected to continue for a number of years beyond the presently-indicated commencement date of 2010. The point, then, is that long time-horizons are an inherent character of the contract's design.

suspension clause in the Standard Contract contemplates the issuance of a suspension order in two circumstances only: in the event of the *purchaser's* failure to perform or in the event of a national emergency that requires DOE to give priority to other Government programs. Since neither of these contingencies are present here, there can be no basis upon which to characterize the present delay as a *de facto* suspension.

Nor can we reach beyond the literal text of the suspension clause (or, for that matter, any other clause in the Standard Contract) to create a breach remedy for an unreasonable delay. That line of reasoning is foreclosed to us because the avoidable delays provision encompasses "any" delay. Hence, it encompasses all delays—reasonable as well as unreasonable.

For each of these reasons then, the constructive suspension doctrine can find no application here.

## C. *The Argument of "Complete Relief"*

We move on now to another branch of plaintiff's argument. Plaintiff contends that even if the court were to find that the Government's failure to perform constituted a delay within the meaning of the avoidable delays provision, nevertheless, Northern States would not be required to pursue the remedies provided by that provision because those remedies are inadequate and incomplete. Specifically, plaintiff points out that, in the event of a delay, the equitable adjustment contemplated by the avoidable delays provision is an adjustment in "the charges and schedules specified by the contract ... to reflect any additional costs incurred by the party not responsible for or contributing to the delay." This remedy, plaintiff maintains, is inadequate because, under the Act's requirement of full cost recovery, DOE would be obligated to increase purchaser fees in order to insure the Waste Fund's sufficiency

to meet program expenditures.[4] As plaintiff sees it then, because DOE is statutorily required to carry out its contract responsibilities at no cost to the Government, any immediate reduction in the fees charged plaintiff would necessarily require DOE to increase those fees at a later date. In short, plaintiff would end up funding its own equitable adjustment. Such a remedy, plaintiff contends, is no remedy at all. Plaintiff goes on to say that because the contract remedy is so plainly inadequate, a purchaser is not obliged to pursue that remedy but may instead seek relief in court. In support of this last point, we are referred to a number of cases which, according to plaintiff's reading of them, stand for the proposition that a claim does not arise under a contract unless, as plaintiff puts it, "a contract clause provides the claimant with 'complete' relief."

■ The court has carefully considered plaintiff's argument but cannot accept it. Ever since the decision in *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), it has been a settled rule of government contract law that courts may not displace, through the substitution of their own procedures, the administrative procedures that parties have chosen for the resolution of their contract disputes. In that case, the Court of Claims had retained jurisdiction over a contract appeal (and remanded the matter to its Trial Division for further proceedings) after finding that the contract appeals board had erroneously declined to hear the matter because of an incorrect ruling on timeliness. In reversing the court's decision and directing that the claim be allowed to proceed before the contract appeals board, the Supreme Court explained that utilization of administrative procedures contractually bargained-for was dictated by "respect for the parties' rights to contract and to provide for their own remedies." *Id.* at 429, 86 S.Ct. 1539.

4. Section 111 of the Act describes the Nuclear Waste Fund as "composed of payments made by the generators and owners [of radioactive waste] that will ensure that the costs of carrying out activities relating to the disposal of such waste ... will be borne by the persons responsible for generating such waste...." 42 U.S.C. § 10131(b)(4). Correspondingly, section 302 of

the Act authorizes the Secretary of DOE to enter into contracts with the generators and owners of the radioactive waste and it further directs that "[s]uch contracts shall provide for payment to the Secretary of fees ... sufficient to offset [authorized] expenditures [from the Waste Fund]." 42 U.S.C. § 10222(a)(1).

■ We see that same policy concern in play here. The provisions set forth in the Standard Contract were the product of an extensive notice and comment period. It must be assumed therefore that those provisions—and the remedies they specify—accurately reflect the intentions of the contracting parties. And, even if those remedies seem unexpectedly to fall short of what the parties originally (but perhaps mistakenly) had envisioned, deference to the administrative process dictates that the contracting agency, as the party charged by Congress with fulfillment of the Act's goals, be given the first opportunity to rectify the problem. It is DOE's decision that was bargained for; not ours. It would therefore be an unwelcome intrusion upon the administrative process—indeed, an unlawful intrusion—were this court to side with plaintiff in saying that the administrative remedy appears unsatisfactory and therefore may be disregarded in favor of a breach action in this court.

This last, of course, is the point plaintiff argues. Essentially, it is plaintiff's position that an administrative remedy that does not provide a reasonably adequate substitute for the damages available in a breach action does not offer "complete relief." And, where the relief afforded is not complete—plaintiff's position continues—the claim it affects does not "arise under" the contract.

We do not agree with this position. Under the accepted meaning of the phrase, a claim is said to "arise under" the contract where the contract contains "some substantive contract provision [that] authorizes the granting of a specific type of relief [for the particular injury in question]." *Len Co. & Assoc. v. United States,* 181 Ct.Cl. 29, 51, 385 F.2d 438, 451 (1967). That the relief specified may be less than a common law remedy might offer in the same circumstances has nothing to do with the issue. The only consideration that counts is whether the parties' contract contains language that addresses the specific contingency to which the claim relates and specifies the adjustment that is to be provided in the event liability is established. Where these twin considerations exist, the claim "arises under" the contract.

■ As to the several cases that plaintiff cites, we fail to find in them any confirmation of the position claimed. To the contrary, the cases underscore the point that it is the absence of a remedy, as opposed to the sufficiency of a remedy, that determines whether the contractor may seek relief outside of the contract. For example, in *Edward R. Marden Corp. v. United States,* 194 Ct.Cl. 799, 442 F.2d 364 (1971), the question was whether the contractor could maintain a breach action to recover the costs related to allegedly faulty government specifications that had resulted in the collapse of a hanger under construction. The Government maintained that the matter was resolvable under the contract because, under the contract's Permits and Responsibilities article, the contractor remained responsible for all materials and work performed until final acceptance of the project. It was the Government's position that a claim under the contract was identifiable through a contract clause which specified the rights and obligations of the parties relative to the claim in controversy.

The court rejected this contention, explaining that "[t]here is nowhere in the [Permits and Responsibilities] article a provision for a contract adjustment in the event that work or materials are damaged or destroyed. If plaintiff had been found by the board not to have borne the risk of the hanger's collapse, the board would not have been able to fashion an affirmative remedy for plaintiff under the Permits and Responsibilities article." 194 Ct.Cl. at 807, 442 F.2d at 368. Accordingly, the contractor was permitted to proceed with a breach claim. *Marden* stands squarely for the proposition that "complete relief" means that a claim arises under a specific provision of the contract and is made adjustable by or under it.

Another case cited by plaintiff—*Koppers/Clough v. United States,* 201 Ct.Cl. 344, 1973 WL 21338 (1973)—echoes a similar theme. There the question was whether a government furnished property clause that restricted the Government's liability to an adjustment under the changes article "for changes in the property furnished" barred the contractor from pursuing judicial relief to

recover damages attributable to the Government's late delivery of a pier.

The court, after noting that a contractor potentially could suffer greater injury through improper delivery in the furnishing of an item than merely through changes in the item, went on to say: "We see nothing to suggest that claims of this kind—probably the more important of the potential injuries to the contractor—were to be eliminated wholesale, so that there could be no remedy at all either through the administrative mechanism or through the courts." 201 Ct. Cl. at 355. The court concluded that, in the absence of contract language exculpating the Government from any further or additional liability, the administrative remedy would not be viewed as exclusive. *Id.* at 356.

Although *Koppers/Clough* addresses a different situation from that encountered in *Marden,* the two cases demonstrate the same essential point: the determination of whether a breach remedy exists apart from the remedy provided by the contract is fundamentally a question of contract interpretation. And, as with all questions of contract interpretation, courts look to the meaning of contract terms by looking to the everyday usage of the words employed and to the evident purposes those words aim to secure.

In this case we have a contract provision that speaks to "any" delay caused by circumstances within the reasonable control of either party and directs that "the charges and schedules specified by this contract ... be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for ... the delay." Examining this language in light of the above discussion, we think it correct to say that the contract affords plaintiff "complete relief." [5]

### D. The "Remedies" Clause Argument

█ A final argument that plaintiff presents here centers on Article XI of the contract. That article, titled "Remedies," provides that "[n]othing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Plaintiff points out that language similar to Article XI is found in the standard default clause of a government contract and that, in that context, the language has been held to preserve the Government's right to pursue common law breach damages in lieu of or in addition to the administrative remedies provided under the contract. The cases so holding include: *Tester Corp. v. United States,* 1 Cl.Ct. 370, 376 (1982), *Mar-*

5.   During the oral argument of the case, plaintiff's counsel drew the court's attention to certain language in *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) which, it was said, identifies the rule of decision that is applicable to our situation. The language in question, which occurs as part of the opinion's general background discussion regarding the Court of Claim' disputes clause jurisprudence, reads as follows: "But the Court of Claims has also ruled that when only partial relief is available under the contract—*e.g.,* an extension of time under [the changed conditions clause]—the remedies under the contract are not exclusive and the contractor may secure damages in breach of contract if the Government's conduct has been unreasonable." *Id.* at 402, 86 S.Ct. 1545. Plaintiff reads this language to mean that if a contractor cannot be made whole by pursuing its relief under the contract, it may bypass the administrative process and sue directly in court for breach of contract.

We do not agree with this interpretation. Contrary to plaintiff's reading, the term "partial relief" does not refer to monetary relief that is less than fully compensatory. Rather, that term is descriptive of those earlier adjustment clauses—preceding adoption of the suspension of work clause—which limited a contractor's remedy for

government delay to a time extension. It was of such clauses that the Court of Claims declared that, absent express exculpatory language, the Government could not rely on such a "time-only" provision to cut off a contractor's right to damages for unreasonable delay. *See e.g., Kehm Corp. v. United States,* 119 Ct.Cl. 454, 471–72, 93 F.Supp. 620, 624–25 (1950); *Fuller Co. v. United States,* 108 Ct.Cl. 70, 93–102, 69 F.Supp. 409, 410–15 (1947).

The limited relief provisions encountered in the cited cases find no parallel here. Two distinctions are at once apparent. First, the avoidable delays provision of the Standard Contract does not confine its relief to a time extension only. Rather, that provision contemplates an equitable adjustment that embraces both time *and* money: "the charges and schedules specified by this contract will be equitably adjusted to reflect any additional costs incurred by the party not responsible for or contributing to the delay." Second, the avoidable delays provision cannot be construed as extending only to reasonable delays. By its very language, the provision extends to "any delay." Given these points of difference, we can find no instructive value in the quoted text on which plaintiff relies.

*ley v. United States,* 191 Ct.Cl. 205, 223, 423 F.2d 324, 334 (1970) and *Rumley v. United States,* 152 Ct.Cl. 166, 171–72, 285 F.2d 773, 777 (1961). Plaintiff's argument is that, based on the similarity of their texts, we should hold that Article XI, like its default clause counterpart, preserves a party's right to pursue a breach action in court in lieu of being restricted to an administrative remedy under the contract.

We do not find this argument persuasive. Although the words of the default clause are indeed similar to those of the remedies clause, they are at the same time significantly different. To explain: The default clause grants the Government the right to terminate the contract in the event of a contractor's default, to reprocure the contract product or services, and to hold the contractor liable for any excess reprocurement costs that may be incurred. The clause further provides—and these are the words of importance to plaintiff—"[t]he rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract." 48 C.F.R. § 52–249–8 (1998).

The difficulty that we see in plaintiff's attempt to use the quoted text as a reference point for the interpretation of Article XI is that the quoted text contains the words "in addition to" thereby making it clear that the specific administrative remedies provided by the default clause are not the Government's only remedies. No similar language occurs in the remedies clause. The clause stands alone, disassociated from any other provision in the contract. Yet, without these "tie-in" words, the interpretation plaintiff places upon the language becomes highly doubtful. Indeed, to accept that interpretation is to say that, while the parties took care to adopt a comprehensive administrative mechanism for the resolution of particular contract disputes and to specify particular remedies, neither expected to be held to these prescriptions. Keeping in mind that contracts are written to provide certainty in business dealings, plaintiff's interpretation seems less than plausible.

Proceeding therefore from the accepted premise that separate provisions of a contract are to be understood as addressing separate concerns, but that all are to be read as parts of a whole, Restatement (Second) of Contracts § 202(2); § 203(a) (1981), we think it reasonable to construe the remedies clause simply as an acknowledgment that rights arising outside of the contract—*i.e.,* those for which the contract provides no specific relief—were intended to remain actionable. Based on this interpretation, the remedies clause of the Standard Contract does not offer plaintiff a source of rights or remedies that may be asserted in substitution of those arising under the contract.

### III

In addition to its claim of partial breach (Count I of the complaint), plaintiff has also asserted a claim for breach of the contract's implied covenant of good faith and fair dealing (Count II).

We do not regard Count II as presenting a claim for relief distinct from the claim for breach of contract based on Government delay. Claims are made up of facts, not theories. *See* Restatement (Second) of Judgment § 24 cmt. a (1982). Hence, the Government's delay gains no added dimension by also being described here as a breach of the contract's implied covenant of fair dealing. The facts making up plaintiff's delay claim, being redressable under the contract, remain so even if we give them a different label.

### CONCLUSION

For the reasons set forth in this opinion, the court concludes that plaintiff must pursue its claims through the administrative remedies established in the Standard Contract. Consistent with this ruling, plaintiff's motion for summary judgment is denied and defendant's motion to dismiss is granted.

The Clerk shall enter judgment accordingly. No costs.