## COMMONWEALTH EDISON CO., Petitioner

### v.

## UNITED STATES DEPARTMENT OF ENERGY and United States of America.

### No. 88–1585.

United States Court of Appeals, District of Columbia Circuit.

Argued April 3, 1989.

Decided June 23, 1989.

Pamela H. Anderson, with whom Jay E. Silberg, Washington, D.C., was on the brief, for petitioner.

Frederick C. Williams, Acting Asst. General Counsel, U.S. Dept. of Energy, with whom Marc Johnston, Acting Deputy General Counsel, U.S. Dept. of Energy, Washington, D.C., and Robert D. Wittenauer, Atty., U.S. Dept. of Energy, Manassas, Va., were on the brief, for respondents.

Robert S. Greenspan, Silver Spring, Md., and William G. Cole, Attys., U.S. Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Before MIKVA, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

In this petition for review of a decision by the U.S. Department of Energy ("DOE") Board of Contract Appeals, the Commonwealth Edison Company ("Commonwealth Edison") challenges DOE's application of an interest rate based on the market yield of U.S. government securities to Commonwealth Edison's debt to the Nuclear Waste Fund ("Fund"), established pursuant to 42 U.S.C. § 10222. Commonwealth Edison asserts that the phrase "Treasury bill rate" in a DOE standard form contract providing for payments to the Fund, 10 C.F.R. § 961.11 (1988), means that the lower "discount rate" should be used instead of the so-called "investment yield rate." We hold that DOE's interpretation is entitled to deference because it is construing a regulation of its own drafting, and we uphold DOE's interpretation as reasonable.

## I.

The central issue in this case is the difference between the "discount rate" and "investment yield" of short-term U.S. government securities. The contract into which the parties entered provided that interest would be computed according to the "13–week Treasury bill rate, as reported." DOE contends that this means interest should be calculated according to investment yield; Commonwealth Edison insists that the discount rate (which is always lower) should be used.

The ambiguity arises from the manner in which the Department of the Treasury ("Treasury") sells its short-term securities, known as "bills." To say that a $100 26–week Treasury bill is issued at a *discount rate* of 8.705 percent means that the price

of the bill is $100 - 182/360 \times 8.705 = \$95.60$. For each $95.60 an investor pays, the government agrees to repay him $100 182 days later. The *investment yield* over the 182 days is $(100 - 95.60)/95.60 = 4.60$ percent, equivalent to 9.2 percent per year simple interest or 9.4 percent compound interest. *See* R. Brealey & S. Myers, *Principles of Corporate Finance* 682 (2d ed. 1984). The *discount rate* is a financial term used chiefly by the Department of the Treasury and bond traders; it is the fraction of (amount discounted)/face value of the bill. The *investment yield* represents the actual rate of return obtained by an investor: (amount discounted)/price. The discount rate is the same as the rate of return only if the bill is sold at par.

The case *sub judice* involves a contract entered into pursuant to the Nuclear Waste Policy Act of 1982 ("Act"), 42 U.S.C. §§ 10101 *et seq.*, in which DOE agreed to dispose of nuclear waste generated by Commonwealth Edison. Under the Act, DOE charges an ongoing fee set forth in section 10222(a)(2) for disposal of spent nuclear fuel and high-level nuclear waste generated on or after April 7, 1983, which is not at issue here. For waste generated *before* that date, Congress directed that the Secretary of Energy ("Secretary"):

> establish a 1 time fee per kilogram of heavy metal in spent nuclear fuel, or in solidified high-level radioactive waste. Such fee shall be in an amount equivalent to an average charge of 1.0 mil[1] per kilowatt-hour for electricity generated by such spent nuclear fuel, or such solidified high-level waste derived therefrom * * *.

42 U.S.C. § 10222(a)(3).

Pursuant to section 10222(a)(4), the Secretary published after notice and comment a "Standard Contract for Disposal of Spent Nuclear Fuel and/or High–Level Radioactive Waste" ("Standard Contract"), 48 Fed. Reg. 16,590 (1983) (codified at 10 C.F.R. § 961.11). Article VIII of the contract establishes fees and terms of payment for the disposal services provided by DOE. Under subsection B.2 of Article VIII, utilities are permitted two years to select one

of three payment options for disposal of nuclear waste generated prior to April 7, 1983. Option 1 provides for installments to be paid quarterly over a period of 10 years, with the final payment to be made before the first scheduled delivery date to DOE. Until the first payment, interest is calculated according to the fluctuating "13–week Treasury bill rate"; on the date of first payment, it is set at the "ten-year Treasury note rate" in effect at that date. Option 2, which Commonwealth Edison selected, permits a utility to make a single lump-sum payment at any time prior to the first delivery of nuclear waste to DOE. Interest accrues from April 7, 1983 until the date of payment according to the "13–week Treasury bill rate as reported on the first such issuance" for each three-month period. Option 3 allows a utility to make a single payment in full within 2 years after executing its contract with DOE, or before June 30, 1985, whichever is later. No interest is charged if a utility chooses option 3. Utilities were required to enter into the Standard Contract by June 30, 1983, and to select a payment option by June 30, 1985. *See* 42 U.S.C. § 10222(b)(2).

Commonwealth Edison entered into a Standard Contract with DOE on June 17, 1983, *see* Contract No. DE–CR01–83NE44372. On May 29, 1985, DOE sent letters to Commonwealth and other contracting utilities on the subject of "Procedures for One–Time Fee Payments Under the Standard Spent Nuclear Fuel Disposal Contract." The letter itself did not mention how interest was to be calculated, but the last sentence of an attachment noted:

With respect to the 13–week T-bill rates referenced in the contract, there is enclosed, for your convenience, a copy of the U.S. Treasury Department *investment/yield rates* for 13–week T–Bill[s] from July 19, 1982, to April 15, 1985. Your attention is directed to the "Issue Date" and the "13–week" columns.

(emphasis added). DOE attached four pages entitled "Average Discount Rates and Yields for Weekly Auctions of Treasury Bills." Two of the four pages displayed both discount rate and investment

yield data; two pages showed only investment yields.

By letter of June 13, 1985, Commonwealth Edison selected payment option 2 (the one-time fee). On November 4, 1985, DOE's Office of Departmental Accounting wrote Commonwealth Edison seeking to confirm the amount that DOE believed the utility owed the Nuclear Waste Fund. The interest rates used by DOE were in fact Treasury bill investment yields, although they were not so labelled. On December 23, 1985, Commonwealth Edison responded to DOE's letter, noting that "[w]e confirm the total one-time fee amount" but arguing that "the amount of interest accrued on the one-time fee * * * was not calculated [by DOE] correctly pursuant to the contract." Commonwealth Edison recalculated the amount due using the Treasury bill discount rate.

On January 29, 1986, DOE's Office of Special Accounts and Payroll Division provided Commonwealth Edison and other utilities with schedules setting forth the investment yield for weekly auctions of 13–week Treasury bills in the period from July 19, 1982 to January 13, 1986, and indicated that those figures were to be used in determining interest on the one-time fee. DOE stated that it was sending the information because

[w]e have become aware some companies are experiencing difficulty in obtaining the 13–Week T-bill investment/yield rates necessary to accrue interest payable to the U.S. Department of Energy under Option 1 or Option 2 of the contract for disposal of spent nuclear fuel.

On March 3, 1986, Commonwealth Edison replied that interest should be calculated according to discount rates rather than investment yields. By letter of April 25, 1986, DOE's Contracting Officer rejected this position. As provided in the contract, *see* 10 C.F.R. § 961.11, Article XVI, Commonwealth appealed that decision to the Department of Energy Board of Contract Appeals, which upheld DOE's interpretation. This petition for review followed.

## II.

Much in this case turns on whether the Standard Contract is to be interpreted as a contract or a regulation. We are mindful that many contracts to which the United States government is a party are codified in regulations, *see, e.g.,* 48 C.F.R. Part 52 (1987), so that the mere appearance of a standard form in the Code of Federal Regulations does not perforce eliminate its identity as a contract. Based on the peculiar circumstances of the case before us, we find that the Standard Contract into which the parties entered should be viewed as a regulation. Although the statute specifies that the Secretary must "enter into contracts" in order to "provide for payment * * * of fees" into the Fund, 42 U.S.C. § 10222, this is a matter of form rather than content.

Few substances are as extensively regulated as high-level nuclear waste. From its genesis as uranium ore, nuclear fuel is subject to a broad array of licensing requirements and safety standards imposed by the Nuclear Regulatory Commission ("NRC"), *see* 10 C.F.R. Parts 20, 30, 31, 32, 33, 39, 40, 50 (1988). The packaging, transportation, and storage of spent fuel and other high-level waste is closely monitored, *see* 10 C.F.R. Parts 53, 70, 71, 72, 74 (1988). Permanent disposal is not now available, although the federal government has undertaken the responsibility for constructing a repository for high-level nuclear waste, *see* 42 U.S.C. §§ 10131–45; 10 C.F.R. Part 60 (1988). No alternative means of permanent disposal is currently planned; if a private repository were constructed, it would be subject to stringent regulation by both the Environmental Protection Agency ("EPA") and the NRC, *see* 42 U.S.C. § 10141. For example, the repository would have to meet a plethora of management, storage, and disposal rules governing the geologic stability of the site, containment and ground water protection, disposal methods, and worker safety, *see* 40 C.F.R. Part 191 (1988). The standards are designed to provide a reasonable expectation of minimal radionuclide release over a period of 10,000 years, *see* 40 C.F.R. § 191.13(a) (1988). In short, Common-wealth Edison was not free to dispose of its waste in whatever manner it desired; indeed, it had no real choice but to agree to whatever terms the federal government offered.

This is not, in other words, the typical government contracts situation. The fee paid by utilities into the Fund resembles an assessment or tax more than it does a freely negotiated price. The size of the fee, moreover, is fixed by statute at the equivalent of 1 mill per kilowatt-hour of electricity generated, *see* 42 U.S.C. § 10222(a)(3). Because we interpret Commonwealth Edison's challenge as seeking review of a "final decision or action of the Secretary" in the form of a regulation promulgated under the Act, there is no question that we have jurisdiction to hear the petition, *see* 42 U.S.C. § 10139(a)(1); *Consolidated Edison Co. v. U.S. Department of Energy,* 870 F.2d 694, 695–96 (D.C.Cir.1989); *Wisconsin Electric Power Co. v. U.S. Department of Energy,* 778 F.2d 1, 2–3 (D.C.Cir.1985); *General Electric Uranium Management Corp. v. U.S. Department of Energy,* 764 F.2d 896, 900–04 (D.C.Cir.1985).

More importantly, because the Standard Contract is a regulation, deference is owed to DOE's construction. "An agency's interpretation of its own regulations is entitled to great weight." *Tallahassee Branch of the NAACP v. FCC,* 870 F.2d 704, 710 (D.C.Cir.1989). Thus, while the rule known as *contra proferentum* ordinarily requires that ambiguities in a contract be construed against its drafter, *see Sturm v. United States,* 421 F.2d 723, 727 (Ct.Cl.1970), the doctrine is inapplicable in the regulatory context. Notice and comment procedures afford interested parties input into the drafting of the regulation, *see* 48 Fed.Reg. 16,590 (1983) (announcing the Standard Contract in its final form and responding to public comments), and the terms of a regulation must be interpreted in a manner that promotes the public interest. A reviewing court should therefore construe the regulation to "effectuate the intent of the promulgators of the regulation," rather than interpreting it "to give it

the effect intended by both parties." *Honeywell, Inc. v. United States,* 661 F.2d 182, 186 (Ct.Cl.1981). "The fact that a regulation may be incorporated into a contract does not require a different rule for regulation interpretation." *Id.; see also Sante Fe Engineers, Inc. v. United States,* 801 F.2d 379, 381 (Fed.Cir.1986); *Central Electric Cooperative, Inc. v. Bonneville Power Administration,* 835 F.2d 199, 203–04 (9th Cir.1987); *cf. Bennett v. Kentucky Dep't of Educ.,* 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985).

Under this standard of review we have no difficulty upholding DOE's construction of the phrase "Treasury bill rate." The "discount rate" and "investment yield" are two methods of describing the same transaction. The discount rate is a financial artifact resulting from the manner in which the Treasury sells short-term debt obligations—at a discount from par, rather than as interest-paying securities. No investor, however, would use the discount rate to describe the rate of return of a Treasury bill; that function is performed by the "investment yield." *See* 28 U.S.C. § 1961 (providing for interest on money judgments in federal civil cases "at the coupon yield equivalent" of 52-week Treasury bills at the latest auction); 26 C.F.R. § 1.103–8(a)(7)(ii) (1988) (Internal Revenue Service regulation referring to yield as "the Treasury bill rate" in computing interest on bonds to finance certain exempt facilities); 50 Fed.Reg. 33,559 (1985) (IRS notice of proposed rulemaking governing the tax treatment of below-market interest rate loan transactions referring to "the average yield on government securities as reflected in the weekly Treasury bill rate"). We find DOE's interpretation reasonable because the yield represents the true cost of money to the government and is a more meaningful statistic; it measures the actual rate of return on Treasury bills, rather than simply the amount that the Treasury discounts its securities from face value.

Nor is the investment yield interpretation unfair to Commonwealth Edison, which had notice of DOE's construction of the phrase "Treasury bill rate." The statement of the rule in 1983 informed utilities that interest would be charged on the fee "at the Government's cost of money" until payment was made, 48 Fed.Reg. 16,593 (1983). Commonwealth Edison in fact suggested to the DOE in its comments on the rule that interest should be charged to utilities so that "the Government * * * is compensated for its borrowing costs." The investment yield measure performs such a function; the discount rate does not. The May 29, 1985 letter from DOE also put Commonwealth Edison on notice that DOE considered the investment yield to be the proper measure of the Treasury bill rate. An attachment to the letter specifically directed the utility's attention to "investment/yield rates for 13-week T–Bill[s] from July 19, 1982 to April 15, 1985," and two of four appended pages contained only investment yield data.

We reject Commonwealth Edison's assertion that DOE's construction is in conflict with the language of the Standard Contract, which provides that interest would be calculated according to the "13–week Treasury bill rate, as reported." The investment yield is a rate, as the parties so stipulated; indeed, it is an *interest* rate, in contrast to the discount rate. The yield is also reported, though perhaps, as the parties agreed, less widely than the discount rate. But this is somewhat misleading because the yield and discount are related, and one can be derived from the other. Commonwealth Edison's claim that the yield is unreported is akin to the argument that because a table lists only the dollar-yen conversion rate, the converse yen-dollar rate is "unreported."

DOE's construction is also consistent with other parts of the statute. When the Fund must borrow, the Act requires the Secretary of Energy to issue obligations to the Treasury, which "shall bear interest at a rate * * * determined by taking into consideration the average *market yield* on outstanding marketable obligations of the United States of comparable maturities." 42 U.S.C. § 10222(e)(5) (emphasis added). Similarly, when the Secretary of Energy invests surplus money from the Fund he or she must obtain "at least the current aver-

age *market yield* on outstanding marketable obligations of the United States." 42 U.S.C. § 10222(e)(3)(B) (emphasis added). It would be odd if the Fund were required to make up for an underpayment by Commonwealth Edison at a higher rate of interest than the utility itself pays.

Congress, in passing the Nuclear Waste Policy Act, expressed its intention that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel," 42 U.S.C. § 10131(a)(4). Use of the lower discount rate would subsidize Commonwealth Edison. Under option 2, deferral of payment on the one-time fee the utility owes is equivalent to a loan from the Nuclear Waste Fund as of April 7, 1983, due on an as yet undetermined date with interest then accrued on the outstanding balance. Use of the discount rate would permit Commonwealth Edison to invest the deferred funds in Treasury bills for the same period as it defers payment, receive the investment yield on the money invested, pay the Fund the inherently lower discount rate, and pocket the difference. This risk-free arbitrage cannot be the result Congress intended.

Commonwealth Edison does not deny that the discount rate would result in a subsidy, but maintains that that is not a reason to reject its use. Option 3, for example, provides for a single lump sum payment before June 30, 1985, with no interest accruing after April 7, 1983, and thus also confers a subsidy on generators of high level nuclear waste. We find this argument unavailing. Option 3 requires a utility to satisfy its obligation to the Fund in full before June 30, 1985, unlike either of the other two modes of payment. DOE could reasonably have differentiated among the options on this basis, without surrendering its ability to insist on full cost recovery from those like Commonwealth Edison who selected option 2.

Commonwealth Edison also points to one case, *In re Lawson Square*, 61 B.R. 145 (Bankr.W.D.Ark.1986), *aff'd*, 816 F.2d 1236 (8th Cir.1987), in which a federal court has used "Treasury Bill rates" to mean "dis-count rates." The interpretation of the phrase "Treasury bill rate" was not an issue in *Lawson*, however, and it was not part of any holding, on the part of either the bankruptcy court or the court of appeals, *see* 816 F.2d at 1238 n. 3. Instead, the bankruptcy court merely reported the parties' stipulations as to the "T-bill rates" on various days. *See* 61 B.R. at 147. There is no reason why this court should follow the stipulation of the parties in *Lawson*, who might have had other reasons for selecting the discount rate.

### III.

For the foregoing reasons, the petition for review is

*Denied.*