**INDIANA MICHIGAN POWER CO., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 98–486C.

United States Court of Federal Claims.

June 27, 2003.

Alex D. Tomaszczuk, Shaw Pittman LLP, Washington, D.C., for plaintiff. Jay E. Silberg, Devon E. Hewitt, and Daniel S. Herzfeld, of counsel.

Harold D. Lester, Jr., Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Heide L. Herrmann, Stefan Shaibani, Marian E. Sullivan, William L. Olsen, R. Alan Miller, Kevin B. Crawford, Martha S. Crosland, L. Dow Davis, Jane K. Taylor, and Elizabeth Thomas, of counsel.

## OPINION AND ORDER

HODGES, Judge.

Congress authorized the Department of Energy to draft a contract establishing procedures for removing Spent Nuclear Fuel from Indiana Michigan's property beginning January 31, 1998. Indiana Michigan paid fees and assessments to the Government for this service based on its production of electrical power before and after 1983. The Department of Energy did not remove plaintiff's Spent Nuclear Fuel in 1998, and it has not done so to this day.[1]

The parties' agreement does not contain an express rate or schedule for collecting nuclear waste from plaintiff's premises. Plaintiff and defendant filed cross-motions for partial summary judgment on the rate and order of acceptance. Defendant filed a motion for summary judgment on the status of Greater Than Class C Radioactive Waste.[2] The parties agree that the record contains sufficient information for the court to rule on summary judgment.

The Government's acceptance rate after 1998 would have approached 3,000 metric tons per year, (1) to remove plaintiff's annual production of nuclear waste and avoid the need for additional on-site storage capacity;

---

**1.** *See Maine Yankee v. United States*, 225 F.3d 1336, 1343 (Fed.Cir.2000) ("The government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998.").

**2.** Greater Than Class C Radioactive Waste, often referred to as GTCC, is low-level radioactive waste that contains concentrations of certain radioactive nuclides that exceed the concentration limits established by the Nuclear Regulatory Commissioner for Class C waste. *See* 10 C.F.R. § 61.55.

and (2) to remove enough additional waste to eliminate plaintiff's backlog of Spent Nuclear Fuel within a reasonable time. Plaintiff represented to the court that it will not make a claim for damages related to GTCC waste, or argue that defendant should have collected it. Defendant's motion for summary judgment on Greater Than Class C waste is Moot.

## I. BACKGROUND

### A. The Nuclear Waste Policy Act of 1982

Congress authorized the Department of Energy to contract with utilities and other producers of nuclear waste to collect their Spent Nuclear Fuel. The Nuclear Waste Policy Act addressed the "national problem [that] has been created by the accumulation of ... spent nuclear fuel from nuclear reactors ...." 42 U.S.C. § 10131(a)(2)-(A). *See generally* the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101–10270. Disposal of nuclear waste became a "Federal responsibility, and a definite Federal policy ...." 42 U.S.C. § 10131(b)(2). The Act's chief purpose is to insure that "the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste ...." 42 U.S.C. § 10131(b)(1). Utilities and other producers of nuclear waste have paid all costs of the program through fees and assessments. *See* 42 U.S.C. § 10131(a)(4).[3] Indiana Michigan continues to pay for "interim storage" of waste on its property.[4] *See* 42 U.S.C. § 10131(a)(5).

The Department of Energy's duties under the Act were "acceptance of title, subsequent transportation, and disposal of [Spent Nuclear Fuel]." 42 U.S.C. § 10222(a)(1).[5] The Department drafted a Standard Contract for use with participants in the program and published it for comment. *See* Standard Contract for Disposal of Spent Nuclear Fuel and/or High–Level Radioactive Waste, 48 Fed.Reg. 5,458 (Feb. 4, 1983) (codified at 10 C.F.R. § 961.11).

The Standard Contract required DOE to begin disposing of nuclear waste by January 31, 1998 "in return for the payment of fees established by this section ...." 42 U.S.C. § 10222(a)(5)(B). Utilities paid a one-time fee based on electricity generated before April 1983.[6] They have paid assessments based on production into a Nuclear Waste Fund since then.[7] *See* 42 U.S.C. § 10222(c)-(d). The Act and the Standard Contract authorize the Government to increase assessments if the Fund is not sufficient to cover the costs of waste removal. *See* 42 U.S.C. § 10222(a)(4); Standard Contract, Art. I.11. Congress prohibited the Nuclear Regulatory Commission from licensing utilities that do not participate in the Program. *See* 42 U.S.C. § 10222(b)(1)(A). Plaintiff and other utilities have paid more than $10.5 billion into the Nuclear Waste Fund.

### B. Early Proceedings

The Department of Energy advised utilities in 1994 that a repository would not be

3. "[W]hile the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment, the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel." 42 U.S.C. § 10131(a)(4).

4. "[T]he generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel until ... accepted by the Secretary of Energy in accordance with the provisions of this [Act] ...." 42 U.S.C. § 10131(a)(5).

5. "[T]he Secretary is authorized to enter into contracts with any person who generates or

holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1).

6. "[T]he Secretary shall ... establish a 1 time fee ... in an amount equivalent to an average charge of 1.0 mil per kilowatt-hour for electricity generated .... In paying such a fee, the person delivering spent fuel ... to the Federal Government shall have no further financial obligation to the Federal Government for the long-term storage and permanent disposal of such spent fuel ...." 42 U.S.C. § 10222(a)(3).

7. "For electricity generated by a civilian nuclear power reactor and sold on or after the date 90 days after January 7, 1983, the fee ... shall be equal to 1.0 mil per kilowatt-hour." 42 U.S.C. § 10222(a)(2).

available until 2010. Office of Civilian Radioactive Waste Management: Waste Acceptance Issues, 59 Fed.Reg. 27,007–27,008 (May 25, 1994). The Department issued a Final Interpretation in 1995 stating that its statutory authority for disposal of waste in an interim facility had expired and it had no legal obligation to collect the waste until 2010. *See* 42 U.S.C. § 10156.

> After analyzing public comments ... DOE has concluded that it does not have an unconditional statutory or contractual obligation to accept high level waste and spent nuclear fuel beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the Nuclear Waste Policy Act of 1982, as amended.

Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed.Reg. 21,793–21,794 (May 3, 1995).

Indiana Michigan sued to vacate DOE's Final Interpretation. *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C.Cir.1996). The D.C. Circuit held that the 1998 deadline in the Standard Contract did not depend on the existence of a repository, and the Government's obligation to collect nuclear waste covered by the Standard Contract was "unconditional." *Id.* at 1276–77. The court did not defer to DOE's interpretation of the Contract, ruling instead that DOE's treatment of the statute was "not an interpretation but a rewrite." *Id.* at 1276. The court complained that DOE's interpretation "not only blue-pencils out the phrase 'not later than January 31, 1998,' but destroys the *quid pro quo* created by Congress." *Id.* The Department of Energy "does not survive the first step of the *Chevron* analysis." *Id.; see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (according deference to agencies' interpretations of their regulations in appropriate circumstances).

The Department of Energy then described its failure to perform as an "unavoidable delay" under the Standard Contract.[8] Plaintiff and several other utilities returned to the D.C. Circuit, seeking a writ of mandamus. *Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C.Cir.1997). The Circuit did not order the Government to abide by the Contract terms because plaintiffs "must pursue the remedies provided in the Standard Contract in the event that DOE does not perform its duty to dispose of the SNF by January 31, 1998." *Id.* at 756. The Circuit directed the Government not to argue in the future that its failure to comply with the Standard Contract was "unavoidable."

> Given DOE's repeated attempts to excuse its delay on the ground that it lacks an operational repository or interim storage facility, we find it appropriate to issue a writ of mandamus to correct the Department's misapprehension of our prior ruling [in *Indiana Michigan Power Co.*, 88 F.3d at 1276].[9] Accordingly, we order DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998. More specifically, we preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim.

*Id.* at 760.

### C. The Government's Breach

The Department of Energy did not meet the January 1998 deadline. Utilities sued alleging breach of contract, breach of implied

---

8. The Contract states that "neither the Government nor the purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." Standard Contract, Art. IX.

9. The D.C. Circuit held in *Indiana Michigan* that the Government has two distinct duties under the statute. DOE must take title to the waste being held on site by the utilities; and DOE must dispose of that waste. *Indiana Michigan*, 88 F.3d at 1276. "The duties imposed on DOE ... are triggered at different times ...." *Id.* Defendant's duty to take title to the waste begins when the repository is operational and a utility requests delivery; its responsibility to dispose of the waste "is triggered, at the latest, by the arrival of January 31, 1998." *Id.; see also* 42 U.S.C. §§ 10222(a)(5)(A)-(B).

duty of good faith, and Fifth Amendment takings. *See, e.g., Northern States Power Co. v. United States,* 43 Fed.Cl. 374 (1999). The Government argued in response that this court lacked jurisdiction because the utilities had not appealed to the contracting officer and completed the administrative process contained in the Contract. *See* Standard Contract, Art.XVI. Defendant also argued that the plaintiffs' remedy was limited to an equitable adjustment of their fees.[10] The trial court held that each plaintiff was "obliged by the terms of its contract with DOE to pursue its demand for monetary relief at the agency level, *i.e.,* through a claim for equitable adjustment submitted in accordance with the contract's disputes clause." *Northern States,* 43 Fed.Cl. at 376. Northern States and Maine Yankee appealed to the Federal Circuit.

The Federal Circuit rejected the Government's argument on appeal. The disputes clause applied to limited delays in scheduled deliveries that might arise after contract performance began, not to DOE's failure to perform in the first instance. *Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed.Cir.2000). "At present there are no schedules containing specific dates for disposing of the waste of particular companies. It is uncertain when they will be adopted and to what extent, if any, they will, or could effectively reflect the Department's breach of the contract." *Id.* at 1342.

Indiana Michigan sued for damages in 1998. The case was stayed in response to defendant's requests that it be consolidated with a number of similar cases and that the court adopt special discovery procedures. The Chief Judge designated this a lead case in April of this year. Plaintiff then filed its responsive briefs and a cross-motion for summary judgment.

## II. THE CONTRACT

### A. The Standard Contract

The Preamble to the Standard Contract stated that the Department of Energy would have "responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment." 10 C.F.R. § 961.11 (The Standard Contract).[11] The Government agreed to collect the nuclear waste on a schedule that would remove all such materials stored on site. The utilities were responsible for financing the waste disposal program and giving DOE information concerning the discharge rate of nuclear materials. The Contract required the Department of Energy to issue Acceptance Priority Rankings annually based on the age of fuel discharged from reactors. The oldest waste had the highest priority. Art. IV.B.5(a).[12] Other high priorities were materials from abandoned plants, Art. V.B.1(b); and "emergency deliveries." Art. V.D.

The Standard Contract directed the Department of Energy to issue Annual Capacity Reports "for planning purposes" beginning July 1, 1987. Art. IV.B.5(b). These Reports would set forth Projected Annual Receiving Capacities and Annual Acceptance Rankings by DOE for ten-year periods. *Id.*

---

**10.** "[A]ny dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer .... The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board)." Standard Contract, Art. XVI.A.

**11.** High-level radioactive waste is radioactive material produced by reprocessing Spent Nuclear Fuel. Spent Nuclear Fuel has been withdrawn from a nuclear reactor following irradiation, but not separated by reprocessing. The Standard Contract applies to both or either, as it refers throughout to "SNF and/or HLW."

**12.** "Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V [abandoned facilities and emergency deliveries, respectively] and paragraph B.3 of Article VI hereof [improperly described materials]." Art. IV.B.5(a).

The utilities would submit Delivery Commitment Schedules to the Department of Energy beginning in January 1992. These Schedules would identify the Spent Nuclear Fuel that the utilities "wish to deliver to DOE beginning sixty-three (63) months thereafter." Art. V.B.1. The Department would approve or disapprove delivery schedules within three months of receipt. The Department of Energy would advise the utility in writing if it did not accept a plan, and request a revised schedule. The Contract outlined a procedure by which the parties would exchange schedules, then negotiate if they could not agree. Art. V.B.2.

The Standard Contract required utilities to furnish a Final Delivery Schedule to DOE twelve months before the agreed delivery date. Art. V.C. A similar process of approval or disapproval followed, with the same agreement to negotiate if unsuccessful. *Id.* The Department of Energy could accept emergency deliveries anytime upon prior written approval. Art. V.D. Utilities could decide which fuels they would deliver to DOE, and when. "Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE . . . ." Art. IV.A.[13] The utilities could exchange approved Delivery Commitment Schedules with other utilities, subject to DOE approval. Art. V.E. For example, a utility with older Spent Nuclear Fuel and a higher priority ranking could trade or sell its Schedule to a lower-ranked utility. *Id.*

The Contract anticipated the possibility of delays. *See* Art. IX. Unavoidable delays included acts of God, fires, floods, strikes, severe weather, or "acts of Government in either its sovereign or contractual capacity."[14] Art. IX.A. Such delays called upon the parties to notify each other and to make alternative arrangements for delivery or scheduling.

*Id.* Avoidable delays were those caused by most other problems, including fault or negligence, or "circumstances within the reasonable control" of the parties. Art. IX.B. The only remedy provided in this section is an equitable adjustment "to reflect any estimated additional costs . . . ." *Id.*

### B. The 1987 Amendments

Congress realized in 1987 that its program for removing nuclear waste was not proceeding as expected.[15] "The schedules included in the NWPA have proven to be overly ambitious . . . . In the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." S. Rep. No. 100–152, at 5 (1987). The Nuclear Waste Policy Amendments Act of 1987 directed the Department of Energy to build a permanent repository at Yucca Mountain, Nevada. *See* 42 U.S.C. § 10172.

The Department of Energy could operate a temporary depository, known as a Monitored Retrievable Storage Facility, in the meantime. The Act authorized DOE to "site, construct, and operate one monitored retrievable storage facility" subject to certain conditions. 42 U.S.C. § 10162(b). The conditions included the requirement that a permanent repository be licensed first. 42 U.S.C. § 10168(d)(1). Also, "the quantity of [Spent Nuclear Fuel] at the site . . . at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this [Act]" were functional. 42 U.S.C. § 10168(d)(3).

### C. The Missing Term

The statute and the Standard Contract require that DOE take title to all nuclear waste.[16] They do not include a rate of accep-

---

**13.** Utilities are referred to as "Purchasers" in the Standard Contract. *See* 10 C.F.R. § 961.11.

**14.** The D.C. Circuit held that DOE could not use this term to excuse delays resulting from the Government's own acts. Such an interpretation would be "inconsistent with DOE's statutory obligation to assume an unconditional duty." *Northern States,* 128 F.3d at 760.

**15.** "It has become clear that refinement of national policy is needed if the goals of the Nuclear Waste Policy Act are to be achieved smoothly

and cost-effectively and if the Department is to meet its contractual commitment to take spent fuel from utilities beginning in 1998." S. Rep. No. 100–152, at 8 (1987).

**16.** Article III of the Contract provides, "[t]he term of this contract shall be from the date of execution until such time as DOE has accepted, transported from the Purchaser's site(s) and disposed of all SNF and/or HLW of domestic origin from the civilian nuclear power reactor(s) specified in Appendix A." Standard Contract, Art. III.

tance. Plaintiff contends that the rate is necessary to determine damages, and that the court's responsibility in such a circumstance is to supply the missing term. *See David Nassif Assocs. v. United States*, 214 Ct.Cl. 407, 557 F.2d 249 (1977) (task of supplying missing but essential term is a function of the court). The acceptance rate is not missing from the Standard Contract at all, according to defendant. DOE may have omitted the term intentionally.

Several utilities urged that the Standard Contract include a minimum rate of acceptance, but DOE refused.[17] Moreover, the parties established a workable delivery process through exchange of Annual Capacity Reports and Delivery Commitment Schedules, defendant argues. This is not a case in which the parties overlooked a key term. Here, defendant used superior bargaining power to maintain a flexible rate and schedule of fuel acceptance in the Standard Contract. Plaintiff suggests that it was a controversial term that the parties avoided because of time constraints.

### D. Contract or Regulation?

The parties assert that rules of contract interpretation and application of the *Chevron* deference standard are important issues in this case. Plaintiff urges that we construe the Standard Contract against the Department of Energy because it was responsible for the ambiguities. The Standard Contract is a Department of Energy regulation, according to the Government, and we should accord judicial deference to DOE's interpretations of its rules. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Defendant cites *Honeywell, Inc. v. United States*, 228 Ct.Cl. 591, 661 F.2d 182 (1981) for its contention that the Standard Contract is a regulation entitled to the deference accorded any government agency interpreting its own regulations. The *Honeywell* court ruled:

> [P]laintiff would have us invoke the contra proferentem rule against defendant for creating the ambiguity. Plaintiff misun-

derstands the difference between interpretation of a contract clause and interpreting a regulation or statute. In case of the latter, the court's duty is to effectuate the intent of the promulgators of the regulation or statute. A contract clause is construed in order to give it the effect intended by both parties. These are mutually exclusive rules of construction. The fact that a regulation may be incorporated into a contract does not require a different rule for regulation interpretation.

*Honeywell*, 228 Ct.Cl. at 596, 661 F.2d 182 (citations omitted). The D.C. Circuit made a similar ruling involving the contract used in this case. That court stated:

> Much in this case turns on whether the Standard Contract is to be interpreted as a contract or a regulation. We are mindful that many contracts to which the United States government is a party are codified in regulations ... so that the mere appearance of a standard form in the Code of Federal Regulations does not perforce eliminate its identity as a contract. Based on the peculiar circumstances of the case before us, we find that the Standard Contract into which the parties entered should be viewed as a regulation. Although the statute specifies that the Secretary must "enter into contracts" in order to "provide for payment ... of fees" into the Fund, 42 U.S.C. § 10222, this is a matter of form rather than content.

*Commonwealth Edison Co. v. U.S. Dep't of Energy*, 877 F.2d 1042, 1045 (D.C.Cir.1989).

The Contract has some earmarks of a regulation. Regulations that qualify for *Chevron* deference include those subject to "notice-and-comment rulemaking." *United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). The Department of Energy printed the Contract in the Federal Register for comment. *See* 48 Fed.Reg. 5,458 (Feb. 4, 1983). The utilities had little opportunity to negotiate.

---

17. For example, the Tennessee Valley Authority stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act."

## III. DISCUSSION

### A. Contract Interpretation

Neither plaintiff's *contra proferentem* argument nor defendant's *Chevron* analysis is useful in supplying the appropriate acceptance rate. Interpretation of the Contract does not require construction against the Agency as drafter or deference to the Agency as regulator. The D.C. Circuit pointed out that "Congress left open many of the terms of the contracts . . . ." *Northern States,* 128 F.3d at 756. Defendant's Interim Status Report acknowledged that the Standard Contract "was unfortunately developed in such a way that the terms and conditions contained numerous omissions, inconsistencies, ambiguities, and contradictions." Annual Capacity Report Issues Status Report (December 31, 1991).

The Standard Contract and the statute are clear on these points: (1) the Department of Energy must remove all nuclear materials (Standard Contract Art. III); (2) the consideration for removal is "the payment of fees established by [42 U.S.C. § 10222(a)(5)(B) ];" and (3) the process must begin "not later than January 31, 1998 . . . ." *Id.*

1.

█ The Department of Energy has had little success convincing the courts that the Standard Contract is entitled to deference as a regulation. *See, e.g., Indiana Michigan Power Co. v. Dep't of Energy,* 88 F.3d 1272 (D.C.Cir.1996); *Northern States Power Co. v. United States Dep't of Energy,* 128 F.3d 754 (D.C.Cir.1997). Defendant relies on an exceptional case to support its argument that we must defer to DOE's interpretation of the Standard Contract. *See Commonwealth Edison,* 877 F.2d at 1042. The D.C. Circuit based its ruling in part on "the peculiar circumstances of the case before us," and emphasized the highly regulated nature of the nuclear industry. *Id.* at 1045. The court did not discuss further its comment that language in the Nuclear Waste Policy Act directing DOE to "enter into contracts" was a mere formality. *See id.* (requirement that DOE must "enter into contracts . . . is a matter of form rather than content.").

The extent of government regulation affecting an industry has not been determinative of regulatory deference in the D.C. Circuit. For example, an airline industry dispute involved a statute that provided, "[a]n agreement by the Secretary . . . is a contractual obligation of the Government to pay the Government's share of the compensation." *Mesa Air Group, Inc. v. Dep't of Transp.,* 87 F.3d 498, 500 (D.C.Cir.1996) (quoting 49 U.S.C. § 41737(d)). The Circuit rejected the Government's call for regulatory deference, holding that Congress intended that the subsidy agreements be contracts. *Id.* at 504. The court interpreted the contracts according to "neutral principles of contract law, not the deferential principles of regulatory interpretation." *Id.*

Several years after *Commonwealth Edison,* the D.C. Circuit rebuffed DOE's efforts to interpret the Standard Contract by regulation. *See Northern States Power Co. v. United States Dep't of Energy,* 128 F.3d 754, 759 (D.C.Cir.1997) (rejecting DOE's "attempt to water-down its obligations") (quoting *Indiana Michigan,* 88 F.3d at 1276). The court stated that the utilities "must be able to enforce the terms of the contract in a meaningful way . . . . NWPA imposes an obligation on DOE "without qualification or condition." *Id.* Deference to agency interpretations in such circumstances could "lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract." *Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 614 (D.C.Cir.1992) (quoting *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1571 (D.C.Cir.1987)).

The Eleventh Circuit rejected the Government's request for regulatory deference in construing the Standard Contract. *Alabama Power Co. v. United States Dep't of Energy,* 307 F.3d 1300, 1314 (11th Cir.2002) (forcing utilities to bear the costs of DOE's breach was "not what Congress had in mind when it decided to empower the Department to negotiate contracts rather than imposing top-down regulations").

The Federal Circuit has analyzed similar cases under contract principles. *E.g., Maine Yankee,* 225 F.3d at 1336 (rejecting

government argument that its failure to meet contract deadline could be remedied by equitable adjustment). The Government's argument in *Maine Yankee* "may be a possible interpretation and application of the provision, [but] it is neither plausible nor persuasive, and certainly is not preferred." *Id.* at 1341.

The Department of Energy has not offered new regulatory interpretations related to the Contract. We cannot accord special deference to interpretations of the Standard Contract presented by the Department of Justice. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

Congress directed the Department of Energy to "enter into contracts" for removal of nuclear waste. 42 U.S.C. § 10222(a)(1) ("[T]he Secretary is authorized to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel."). Congress was free to set up an entirely different system to finance and to monitor nuclear waste collection, according to normal regulatory procedures. The system that Congress chose in this case created contractual relationships among the parties.

## 2.

■ Plaintiff argues that the court should construe the Contract against the United States because the Department of Energy drafted it. Plaintiff's *contra proferentem* analysis does not apply here. If the omission of a term that explains how long utilities will be responsible for "interim storage" creates an ambiguity, it is a glaring one. *See, e.g., Beacon Constr. Co. of Mass. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963) (*contra proferentem* does not apply where ambiguity is so plain or glaring that it is unreasonable for a contractor not to discover it and inquire); *WPC Enters. v. United States,* 163

Ct.Cl. 1, 323 F.2d 874 (1963) (finding an "inadvertent, but glaring gap ...."); *Consumers Ice Co. v. United States,* 201 Ct.Cl. 116, 475 F.2d 1161, 1165 (1973); *WDC West Carthage Assoc. v. United States,* 324 F.3d 1359 (Fed.Cir.2003).

A contract that is susceptible to more than one reasonable interpretation may be ambiguous. *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.,* 169 F.3d 747 (Fed.Cir.1999). Here, the contract term is missing entirely. "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1981).[18]

## 3.

■ We interpret the Standard Contract according to established contract principles, aided in this case by evidence of congressional intent. Congress evoked the national interest in authorizing this Contract, and drafted some of its terms. *See, e.g., Roedler v. Dep't of Energy,* 255 F.3d 1347, 1352 (Fed.Cir.2001) (holding that statutory intent is highly relevant to contractual interpretation when Congress mandates contract terms) (quoting *Rendleman v. Bowen,* 860 F.2d 1537, 1541–42 (9th Cir.1988)). The Federal Circuit in *Roedler* considered whether ratepayers in Spent Nuclear Fuel cases can be considered third-party beneficiaries. The *Rendleman* case involves a National Health Service Corps scholarship that was more of a grant program than a typical contract. The facts in those cases are different from this one, but the legal principle remains important. *See also Maine Yankee,* 225 F.3d at 1341 ("Congress found [the January 31, 1998 deadline] so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement. The breach involved all the utilities that had signed the contract—the entire nuclear electric industry."); *Northern States,* 128 F.3d at 760 ("or-

---

18. Plaintiff suggests that the parties did not include an acceptance rate in the Standard Contract because it was controversial and sensitive politically. *See* Restatement (Second) of Contracts § 204, cmt. b (1981) (discussion of omitted term "might produce delay or impasse").

der[ing] DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998").[19]

## B. Breach

The Department of Energy announced that its performance under the Contract would be delayed at least twelve years. "Failure to perform a contractual duty when it is due is a breach of the contract." *Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336, 1343 (Fed.Cir.2000) (citing *Winstar Corp. v. United States,* 64 F.3d 1531, 1545 (Fed.Cir.1995), *aff'd* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)). The Circuit agreed with the trial court ruling in *Yankee Atomic* that "Yankee has paid all the contract fees and ... DOE has not begun accepting, transporting, and disposing of Yankee's SNF. Accordingly, DOE has breached the contract." *Yankee Atomic Elec. Co. v. United States,* 42 Fed.Cl. 223, 235 (1998).

Plaintiff was to submit its Delivery Commitment Schedules in April 1997. The date for contract performance was less than a year later, in January 1998. The system could have worked only if the permanent repository or an interim facility had been operational in 1998. Defendant knew that failure to develop a credible waste management system would result in additional costs to the utilities.

> The MRS facility could allow DOE to begin receiving waste in 1998, and the waste acceptance rates of the waste management system could start exceeding reactor discharge rates about eight years earlier than would be the case than if there were no MRS. Thus, without an MRS, utilities

would have to add significantly more new storage capacity....

*Current Status of the Department of Energy's Civilian Nuclear Waste Activities: Hearings Before the Senate Committee on Energy and Natural Resources,* 100th Cong. 169 (April 28–29, 1987).

Defendant argues that the Standard Contract requires only that the Department of Energy *begin* to collect nuclear waste in 1998. The Contract did not obligate DOE to continue taking fuels at a particular rate until a permanent repository had been established. The Government's liability for damages in the meantime would be minimal. This interpretation would allow defendant to remove a single unit of fuel and fulfill its obligation under the Standard Contract. Such an argument is not consistent with the contract requirement that the Government remove all nuclear waste within a reasonable time. It does not comply with congressional expectations or the parties' intentions. It tends to render the Standard Contract illusory. Moreover, a court is obliged to supply missing terms consistent with community standards of fairness and policy. *See* RESTATEMENT (SECOND) OF CONTRACTS § 204, cmt. d (1981).

## C. Rate of Acceptance

### 1.

The Government argues that the parties agreed to a process for determining the acceptance rate in the Standard Contract. Plaintiff submitted Delivery Commitment Schedules in response to defendant's publication of Annual Capacity Reports, and DOE approved plaintiff's Delivery Schedules. Defendant believes that the rate can be divined from plaintiff's "accepted" Delivery Commitment Schedules.[20] Plaintiff's additional costs

---

**19.** *See also* S.REP.No. 100–152, at 9 (1987) ("Authorization of the [MRS] facility will better ensure that the Department is able to meet its contractual commitment to accept spent fuel from utilities beginning in 1998.").

> MRS results in cost advantages, improves system flexibility, and provides insurance in the form of backup storage in the event that sequential repository site characterization does not result in an operating repository by 1998, which is the time the Secretary is obligated to

accept spent nuclear fuel under the contracts with nuclear utilities."
*Id.* at 11.

**20.** Defendant's application of the DCS process to rate and potential damages is interesting and varied. The DCS is a binding commitment once DOE accepts it. A rejected DCS also is binding because it represents the waste that a utility actually wanted DOE to collect. Even if DOE is refusing to accept DCS's, failure to file a DCS results in waiver of all damages.

of storing that material are its damages. "That material" to defendant means the limited amount of waste that plaintiff included in its Delivery Commitment Schedule at DOE's direction. We agree with this method of estimating plaintiff's damages, but the Government used an artificially small quantity of waste to limit its liability. Nothing in the record supports the collection rate that defendant would use—900 metric tons per year.

The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate.[21] The Department of Energy did not consider these forms to be binding. The Capacity Reports establish "projected annual receiving [capacities]" for all facilities that DOE would service under the Contract. Art. IV.B.5. The Contract contemplated that DOE would use these reports for planning purposes only. Art. IV.B.5(b). The Capacity Reports disclaimed any other purpose, specifically stating that they were not binding on either party. One Annual Capacity Report describes itself as

only an approximation of the system throughput rates and is subject to change depending on congressional action regarding the conditions for the siting of an MRS facility, and the system design and configuration. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses, and inform the Purchasers accordingly at the earliest feasible time.

1992 Annual Capacity Report, revised May 1993.

The Contract called upon Indiana Michigan to identify the nuclear waste that it expected DOE to remove. Art. V.B.1. The Standard Contract asked for a sixty-three month advance estimate of plaintiff's needs. The Contract did not authorize the Depart-

ment of Energy to limit its obligations to the utilities by applying statutory limitations that did not exist. The Department of Energy was to approve or disapprove plaintiff's Delivery Commitment Schedules within three months of receipt. See Art. V.B.1. The Contract does not suggest that approval would be based upon Annual Capacity Reports. It does not provide standards for DOE to use in disapproving a delivery schedule.

The Department's instructions to plaintiff for completing Delivery Commitment Schedules stated that utilities must "base their DCS on the allocation contained in the latest ACR." The same instructions advised plaintiff that its DCS was subject to reevaluation:[22]

The process described herein assumes that the [waste management system] will be able to accept the Purchaser's SNF beginning in 1998 according to the acceptance rate in the ACR. In the event such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.

Defendant's instructions limited plaintiff to less than a third of the anticipated acceptance rate, yet DOE attempted to avoid promising that it could meet even the reduced deliveries. The Standard Contract does not permit defendant to limit plaintiff's substantive rights in the guise of "instructions."

The court must give reasonable meaning to all of a contract's terms and not render portions of it meaningless. E.g., McAbee Constr. Inc. v. United States, 97 F.3d 1431 (Fed.Cir.1996). The Standard Contract recognizes that deliveries requested by the utilities' Delivery Commitment Schedules may exceed the annual capacity of a storage facility.[23] The Contract accords priorities to cer-

---

**21.** The Government did suggest a linkage among the Annual Capacity Reports, the Annual Priority Rankings, and the Delivery Commitment Schedules, but the Department of Energy added this concept years after plaintiff signed the Contract. Plaintiff had paid millions of dollars into the Nuclear Waste Fund by then. Indiana Michigan has paid approximately $156 million into the Nuclear Waste Fund since 1983.

**22.** Standard Contract Art. V.B.1 requires the Department to approve or disapprove delivery schedules within three months of receipt. DOE has no contractual right to "instruct" or to "reevaluate."

**23.** "Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate." Standard Contract, Art. VI.B.1

tain fuels in that event, including aged fuel, fuel from abandoned plants, and emergency deliveries. This procedure could not arise under the Government's current interpretation of the Contract. As defendant presents it, DOE's Annual Capacity Reports would distribute storage space available according to binding Delivery Commitment Schedules submitted by the utilities and accepted by DOE. The priority section of the Standard Contract would become "meaningless or superfluous." *See Turner Constr. Co., v. United States,* 54 Fed.Cl. 388, 394 (2002).

2.

The Department of Energy instructed Indiana Michigan to limit its request for deliveries to approximately 217 metric tons of waste over a six-year period. This was plaintiff's share of the limited capacity of an interim facility authorized by the 1987 Amendments to the Nuclear Waste Policy Act of 1982. 42 U.S.C. §§ 10101–10270 (Nuclear Waste Policy Amendments Act of 1987). DOE's instructions imposed a delivery quota on Indiana Michigan based on the 10,000–ton restriction that Congress established for a Monitored Retrievable Storage Facility that never existed.[24]

Indiana Michigan submitted seven Delivery Commitment Schedules seeking collection of nuclear waste totaling 217.63 metric tons during 2001—2006. The Department of Energy approved all of the Schedules in August 1995. Defendant argues that these amounts provide the limit of the Government's liability to plaintiff for breach. This total is much lower than the parties or Congress anticipated because it is based on the artificially low acceptance rate described above.

3.

Plaintiff represents that:

Nearly every document published by DOE throughout the history of the nuclear waste program reflects DOE's intention to take SNF and/or HLW at a rate that ramps up to 3,000 MTU annually once DOE actually begins to dispose of SNF and/or HLW under the Standard Contract

... Multiple DOE witnesses confirmed that DOE believed that acceptance of SNF and/or HLW at a steady state rate of 3,000 MTU annually was necessary to prevent additional on-site storage after 1998 and to begin to eliminate the accumulated backlog of SNF and/or HLW on-site.

The record contains uniform support for this assertion. Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials. We have not attempted to discuss here the entire record support for DOE's intended 3,000–ton annual rate of delivery, but the evidence shows clearly that such a rate was the minimum needed to meet those objectives.

Plaintiff stated at oral argument that utilities produce 2,000 metric tons of new waste per year. That is a generally accepted minimum quantity. A 3,000–ton acceptance rate would permit efficient reduction of the backlog as Congress intended. Defendant's 900–ton rate would cause the Department of Energy to fall farther behind each year. While the 3,000–ton rate has substantial support in the record, the 900–ton rate has none.

Defendant argues that the 3,000–ton rate was a goal or a target, not a contract term. If so, it is the number used most often by Congress and by parties to the Standard Contract. It is a reasonable and responsible rate that represents the parties' intent. It accomplishes the purposes of the Nuclear Waste Policy Act and the Contract authorized by that statute.

The parties understood that utilities were not to store additional waste on site after 1998. This was Congress' purpose in passing the Nuclear Waste Policy Act, and it was the parties' intent in signing the Standard Contract. The Department of Energy would have begun performance by collecting 400 metric tons of nuclear waste in 1998, and ramped up to 3,000 metric tons by the end of 2002. Defendant would have continued per-

---

**24.** Apparently, the Government arrived at this number by dividing the 10,000–ton capacity of a Monitored Retrievable Storage Facility by twelve, the number of years DOE expected to be in breach. This would be 833 tons, which DOE must have rounded up to 900.

formance pursuant to the Standard Contract at a minimum rate of 3,000 tons thereafter.

### D. Remand to DOE

The Government recommends that we remand this matter to the Department of Energy to identify an appropriate schedule. Allowing DOE to provide a schedule that would serve as the basis for its own breach damages seems cumbersome and unfair. The D.C. Circuit criticized the Department of Energy's efforts to absolve itself from liability through an administrative procedure. *See, e.g., Northern States,* 128 F.3d at 759 ("We rejected the Department's attempt to waterdown its obligations, finding that DOE's interpretation would 'destroy[ ] the *quid pro quo* created by Congress' and would mean that the payment of fees into the Nuclear Waste Fund 'was for nothing.'") (quoting *Indiana Michigan,* 88 F.3d at 1276).

This court often calculates damages in contract disputes with agencies of the United States. It is not a duty that calls for the special expertise of the Executive Branch. In any event, such an approach would not be consistent with the court's obligation to supply missing terms of a contract on the basis of fairness and equity. *See* RESTATEMENT (SECOND) OF CONTRACTS § 204 cmt. d (1981) ([T]he court should supply a term which comports with community standards of fairness and policy . . . .").

### IV. CONCLUSION

The court's obligation is to provide a rate of acceptance that the Department of Energy would have employed in absence of the breach. The Government's rate of acceptance is based on statutory limitations applicable to an interim storage facility that was not selected, authorized, or approved. DOE instructed plaintiff not to seek deliveries that would exceed Indiana Michigan's share of a 900–ton limit that the Government argues might have applied had such an interim facility existed.

Utilities produce 2,000 metric tons of nuclear waste per year. Removing that amount would maintain waste accumulation at its current level. Congress and the parties intended that the Department of Energy would eliminate the backlog by removing an amount in excess of the 2,000–ton maintenance level. Plaintiff's share of a 3,000–ton annual rate of removal would dispose of Indiana Michigan's waste production and eliminate its backlog within a reasonable time. The parties should be able to stipulate plaintiff's costs of storing Spent Nuclear Fuel accumulated after January 1998, based on the ultimate 3,000–ton rate. Plaintiff and defendant also may stipulate that the repository will be available in 2010 as expected, and that the Department of Energy will remove plaintiff's backlog within a reasonable time according to its share of the 3,000–ton annual rate. We will use these stipulations to enter judgment promptly. If a trial on damages becomes necessary, we expect to schedule it very soon. The court is available at any time to assist the parties in stipulating damages, or to discuss related matters. Counsel may argue pending motions or other issues at a hearing on July 7 at 1:00 P.M.

Defendant's motion for summary judgment on Greater than Class C Materials is Moot, and therefore DENIED. Defendant's motion for summary judgment on Rate and Order of Acceptance is DENIED. Plaintiff's motion for summary judgment is GRANTED, consistent with the terms of this Opinion.